[L.A. No. 29792. In Bank. Apr. 21, 1971.]

Estate of ELSIE WELLS GERMOND, Deceased.
SALVATION ARMY, Petitioner and Appellant, v.
ALTA EVERETT et al., Claimants and Respondents;
LOS ANGELES COUNTY HEART ASSOCIATION et al.,
Claimants and Appellants.

## COUNSEL

Burris & Lagerlof, Meserve, Mumper & Hughes, Cromwell Warner, Jr., John Deacon, Poindexter & Barger, Cosgrove, Cramer, Rindge & Barnum, Latham & Watkins, John H. Balluff, Nossaman, Waters, Scott, Krueger & Riordan, William L. Scott and Melvin Swift, Jr., for Petitioner and Appellant and for Claimants and Appellants.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Carl Boronkay, Deputy Attorney General, as Amici Curiae on behalf of Petitioner and Appellant and Claimants and Appellants.

Robert W. D'Angelo, Clarence Hansen, Randall Wenker, Larwill & Wolfe, Alan D. Block and Charles W. Wolfe for Claimants and Respondents.

## OPINION

**WRIGHT, C. J.**—Elsie Wells Germond died testate on June 9, 1962. Her will left all her property to her sister, Jessie E. Nulsen, and provided that "In the event of the demise of my sister . . . prior to distribution to her of my estate . . . , my Executor [Earl A. Everett] . . . shall convert my estate and the whole thereof into cash, and from the proceeds thereof, pay to and distribute the same [to 10 named charities in specified fractional shares.]" Mrs. Nulsen did not survive distribution. She died 22½ months after the death of Mrs. Germond. Mrs. Nulsen's will named Mr. Everett as her executor and principal beneficiary.

The Salvation Army, one of the charities named as alternative beneficiaries in Mrs. Germond's will, instituted a proceeding to determine the interests in the Germond estate. Its petition and statements filed in the probate court by eight of the other charities named as alternative beneficiaries of the Germond will claimed that because Mrs. Nulsen did not survive distribution the charities are entitled to their fractional shares designated in the will.

Before the proceeding to determine interests was heard Mr. Everett died. His heirs and the newly appointed administrator of Mrs. Nulsen's estate appeared in the proceeding and claimed that the Germond property vested in Mrs. Nulsen prior to her death. The newly appointed successor executor of Mrs. Germond's estate also appeared.

The trial court found that the Germond estate could and should have been distributed to Mrs. Nulsen prior to her death and, more specifically, that the estate "could and should have been distributed to Jessie E.

Nulsen not later than September 19, 1963."[1] The court applied the rule that vesting of interests which are contingent on surviving distribution cannot be postponed by unreasonable delay in distribution and that when there is such delay contingent interests vest at the time distribution should have been made. (*Estate of Taylor* (1967) 66 Cal.2d 855, 858 [59 Cal.Rptr. 437, 428 P.2d 301].) Therefore, the court ordered the successor executor of the Germond estate to distribute the assets of that estate to the administrator of the Nulsen estate. As a result of this order, the trial court found, the property of Mrs. Germond will be distributed to Mr. Everett's heirs.

Eight of the charities named as alternative beneficiaries of Mrs. Germond's will have appealed. They contend that the evidence does not support the essential findings that the estate could and should have been distributed prior to Mrs. Nulsen's death. Our examination of the record discloses that this contention is correct. As we will explain, Mr. Everett *should* have prepared and filed the federal estate tax return more promptly, but even if he had not delayed unreasonably in that regard he *could* not have distributed the estate prior to Mrs. Nulsen's death without proceeding in other respects in a manner not required by reasonable standards of probate practice.

The administration of Mrs. Germond's estate was interwoven with the administration of the estate of her aunt, Bertha Thomas, who predeceased Mrs. Germond. Before their respective deaths Mrs. Thomas, Mrs. Germond, and Mrs. Nulsen lived together in the City of Los Angeles. Their residence was on a parcel of realty owned by Mrs. Thomas and Mrs. Germond as tenants in common. Mrs. Thomas and Mrs. Germond also owned three parcels of realty in Cedar Rapids, Iowa, as tenants in common. Mrs. Thomas died on April 8, 1961. Mrs. Germond died on June 9, 1962, at the age of 72. Mrs. Nulsen died on April 22, 1964, at the age of 79. The Los Angeles and Iowa real properties were the principal assets of their respective estates.

Mr. Everett, an attorney at law, drafted the wills of Mrs. Thomas, Mrs. Germond, and Mrs. Nulsen. Until his death he was the executor and the attorney for the executor of each of their wills. Administration of the Thomas and Germond estates in Iowa was carried out by William Whipple, ancillary administrator, and John Carpenter, his attorney.

When Mrs. Thomas died in April 1961 her will left cash legacies of $11,000 to persons other than Mrs. Germond and made Mrs. Germond

---

[1]The record does not disclose and the parties to the appeal do not explain why the trial court fixed this particular date, which was 15 months and 10 days after Mrs. Germond's death. We assume that the specific finding is simply a determination that Mr. Everett could and should have made distribution within a period of approximately 15 months.

her sole residuary beneficiary. Mrs. Thomas' estate in California consisted of securities worth $5,200[2] and her half interest (appraised at $77,500 as of the date of her death) in the Los Angeles real property. Her estate in Iowa consisted of $4,300 cash and her half interest (appraised at $89,500 as of the date of her death) in the Iowa real properties. There were no substantial creditors' claims. However, Mr. Everett could not distribute the estate until he obtained money to pay taxes, costs of administration, and the legacies. He had not done this when Mrs. Germond died in June 1962.

In the Germond estate, as in the Thomas estate, there were no substantial creditors' claims and no money to pay taxes and costs of administration. The assets of the Germond estate consisted of $800 cash or its equivalent, Mrs. Germond's undivided half interests in the Los Angeles and Iowa real properties, and her interest in the undistributed Thomas estate.

The three parcels of Iowa realty were income-producing commercial properties. They were depreciating in value because of a business recession and because the buildings on them were old and difficult to maintain. One tenant was about to leave and the prospect of finding a new tenant was not good. The Iowa inheritance tax authorities and the federal estate tax authorities accepted $153,000 as the value of the three parcels as of the date of Mrs. Germond's death.

The Los Angeles real property was appreciating in value. It was a commercial corner at Sunset Boulevard and Fairfax with a gasoline service station at the front and the residence which Mrs. Nulsen continued to occupy at the rear. The service station had been leased by Atlantic Richfield Company since 1938. The lease which was in effect when Mrs. Germond died was for a term ending 1971. The monthly rental was $500 plus a gallonage fee. Total gallonage paid from April 1961 to October 1965 was $20,000. The Richfield company had the right of first refusal if the property was sold. The value of the parcel as of the date of Mrs. Germond's death was fixed at $190,000 for California inheritance tax purposes and $240,-000 for federal estate tax purposes.

Soon after Mrs. Germond's death Mr. Everett directed the Iowa ancillary administrator to sell the Iowa real properties in order to obtain the money needed to complete the administration of the Thomas and Germond estates. This direction was reasonable, expeditious, and authorized by Mrs. Nulsen. Mrs. Nulsen did not authorize Mr. Everett to sell the Los Angeles property. During her lifetime he made no effort to sell it and told prospective purchasers that he was not authorized to sell it.

---

[2]This figure and many of the other figures stated in dollars in this opinion are approximate.

The ancillary administrator sold one parcel of the Iowa realty for $88,000 in December 1962 and the other two parcels for $65,000 in June 1963. However, he could not complete the sales until he cleared the properties of liens for Iowa inheritance taxes and federal estate taxes in the Thomas and Germond estates. The Iowa attorney, Mr. Carpenter, could not compute Iowa inheritance taxes and arrange to clear the liens until he knew the amount of federal estate taxes. Mr. Everett did not prepare and file the Germond federal estate tax return and send a copy of it to Mr. Carpenter until March 1964, six weeks before Mrs. Nulsen's death. Therefore, Mr. Carpenter was unable to consummate the sales and obtain the cash proceeds before Mrs. Nulsen died.

The trial court found that Mr. Everett's delay in filing the estate tax return was unreasonable and that such unreasonable delay was the primary cause of the delay in the consummation of the Iowa sales. The evidence supports that finding. So far as the record shows, however, speedier liquidation of the Iowa real properties would not have enabled Mr. Everett to close the Thomas and Germond estates prior to Mrs. Nulsen's death. The net proceeds of the ancillary administration of the two estates were substantially less than the amount of cash which Mr. Everett would have required in order to make final distribution of the California real property to Mrs. Nulsen before her death, and there was not enough additional cash in California to close the estates. The essential ultimate determination that the Germond estate *could* have been distributed prior to Mrs. Nulsen's death is not supported by the evidence as to the delay in completing the ancillary administration, for that evidence shows only that the executor should have done something which in no event could have expedited distribution.

■ Respondents direct our attention to the testimony of their witness Mr. Thompson, an expert in the field of probate practice, that the executor "could possibly" have made a preliminary distribution of the California real property to Mrs. Nulsen "and if that had occurred the federal tax lien would have followed the property out into the hands of the beneficiary." However, when he was asked whether it would have been "proper" for the executor to make an immediate preliminary distribution of the California real property he testified that he could not answer the question because "I wouldn't have sufficient facts on which to base an opinion." In the actual circumstances of this case such a preliminary distribution would have been unreasonable, to say the least, because it would have burdened the California realty with a federal tax lien and imposed personal liability on the executor for the amount of that lien, and the Germond estate would never have been able to obtain enough cash to clear the lien.

If the executor had sold the California real property within a few months after Mrs. Germond's death he could have made final distribution or at least a substantial preliminary cash distribution[3] to Mrs. Nulsen prior to her death. The executor could have sold the California property easily and quickly. However, there is no express finding as to whether he should or should not have sold it prior to Mrs. Nulsen's death, and we may not infer a specific finding in respondents' favor, because appellants in writing requested a finding that such a sale "would have been contrary to reasonable and accepted probate practice." (Code Civ. Proc., § 634; *Metzinger v. Manhattan Life Ins. Co.* (1969) 71 Cal.2d 423, 429 [78 Cal.Rptr. 463, 455 P.2d 391].)

Moreover, to impose such a duty of sale on the executor in the circumstances shown by the record before us would amount to a holding that because there was a survival of distribution clause in the Germond will the executor was required to administer the estate in a manner different from that required by generally accepted reasonable probate practice. Under commonly accepted, reasonable standards an executor of an estate with properties such as those of Mrs. Germond would exercise a sound discretion in deciding to liquidate the depreciating property and keep the appreciating property. He would have no duty to decrease the total value of the estate by selling an appreciating asset so that he could make a cash distribution favoring one beneficiary over another. We recognize that respondents' expert witness, Mr. Thompson, stated in the course of his testimony that in his opinion a hypothetical reasonable executor administering a will with a condition of survival would "try to meet the condition as soon as possible" and that his hypothetical expert would have sold the Los Angeles real property and made distribution in California "as quickly as possible," regardless of economic factors such as fluctuating market values and regardless of the ancillary administration in Iowa. The law, however, does not require an executor to proceed "as quickly as possible"; it requires him to proceed without "unreasonable delay." (*Estate of Taylor, supra*, 66 Cal.2d at p. 858.)

In the margin we set out a chronological recital of what a reasonably prompt executor could have done to administer the estate in a reasonable manner.[4] That recital shows that the estate could have been dis-

---

[3]In some circumstances a reasonable executor might be required to make prompt preliminary distribution. (Cf. *Estate of Dunning* (1968) 102 N.J.Super. 442 [246 A.2d 142].) Such circumstances are not before us, and nothing in the findings suggests that the trial court considered the propriety or even the possibility of a preliminary distribution.

[4]The executor would file the federal estate tax return soon after the expiration of one year from the date of death. Thus he could make an informed choice between valuing the estate properties as of the date of death or as of one year after death

tributed prior to Mrs. Nulsen's death only on the assumption that the Internal Revenue Service acted with more than its usual promptness and in an unusual manner. A finding that an executor delayed unreasonably cannot rest on such assumptions.

For the guidance of the trial court and the parties in the event of a new trial we refer to three other contentions which are advanced here and which might be renewed. Appellants contend that the doctrines of estoppel and laches preclude the Everett heirs from taking property which came to Mr. Everett because he delayed unreasonably in administering the Germond estate. As amicus curiae the California Attorney General contends that the rule of *Estate of Taylor, supra,* should not apply when its application would permit an executor to profit by his own unreasonable delay. Acceptance of any of these contentions would amount to a ruling contrary to *Taylor's* holding that the conditional interest in that case vested prior to the contingent beneficiary's death, "not because of the executor's wrong, but because that was the time when distribution should have occurred." (66 Cal.2d at p. 859.) We adhere to the *Taylor* holding.

The judgment and orders appealed from are reversed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

(26 U.S.C. §§ 2031, 2032), and at the same time he could furnish the ancillary administrator with the information required to liquidate the ancillary estate.

Had he furnished this information to the ancillary administrator, it appears from a finding of the trial court that the ancillary estate would have been liquidated by September 21, 1963.

With the estate tax return the executor would file his request for determination of the amount of tax and discharge from personal liability. This request would set in motion the Internal Revenue Service's procedure for determining the tax. (26 U.S.C. § 2204.) The trial court found that the Internal Revenue Service "customarily" would not reply to the request until 7 to 12 months after it was filed. There is undisputed evidence that the executor could not have hastened the processing of his estate tax return.

If the Internal Revenue Service replied to his request at the earliest time he could expect (within seven months) he would hear from it in January 1964.

It would be unusual if the Internal Revenue Service did not require an audit at that time, for the estate tax return would include a valuation of income-producing property and also a claimed credit from the Thomas estate.

If the Internal Revenue Service accepted the executor's computations he could well be able to distribute the estate before April 22, 1964, the date of Mrs. Nulsen's death. But the possibility of his being able to start preparations for final distribution as early as January 1964 would depend on the actions of the Internal Revenue Service, not the actions of the executor.